IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| V. | ) | Case No. 1:26-CR-002-TRJ |
| | ) | |
| TODD BURKHALTER | ) | |

**SENTENCING MEMORANDUM**

NOW COMES DEFENDANT TODD BURKAHLTER ("Mr. Burkhalter"), pursuant to 18 U.S.C. § 3553, and files this Sentencing Memorandum in support of a sentence of 168 months of confinement, a sentence sufficient but not greater than necessary to serve each of the statutory sentencing factors.

## I. PRELIMINARY STATEMENT

Mr. Burkhalter asks the Court to impose a sentence of 168 months of incarceration (or 14 years) followed by three years of supervision. This sentence is within the applicable advisory range after accounting for acceptance of responsibility pursuant to *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995). *Rodriguez* authorizes the Court to move down three levels from the offense level encompassing the statutory maximum, here 240 months, to properly account for acceptance of responsibility. A sentence of 168 months falls within that range.

Comparable sentence of 168 months is justified by relevant sentencing statistics, which demonstrate that a 14-year sentence would be reasonable

considering comparable fraud cases involving a defendant with no criminal history, including large loss cases. As Mr. Burkhalter will explain, courts frequently impose sentences well below the technical advisory range under U.S.S.G. §2B1.1 because of the overlapping and compounding number of specific offense characteristics which render ranges unhelpful to sentencing courts.

Finally, a sentence of 168 months is supported by the remaining §3553(a) factors, particu§larly Mr. Burkhalter's personal history and characteristics, including his age and lack of criminal history. Additional incarceration beyond 168 months would not add additional deterrence, promote respect for the law or be necessary for just punishment here.

## II. ARGUMENT

### A. Ms. Burkhalter's Sentencing Guidelines Range Weighs in Favor of a Sentence of 168 months of Incarceration.

The Court is obligated to correctly calculate and consider the advisory sentencing guidelines range. 18 U.S.C. § 3553(a)(4). The range is advisory. A sentence within the advisory range is *not* presumed to be reasonable. Rather, it is one of many factors the Court is obligated to weigh under § 3553 to ensure that the sentence imposed is sufficient but not greater than necessary to parsimoniously serve all the statutory sentencing goals. *United States v. Irey*, 612 F.3d 1160, 1197 (11th Cir. 2010).

*The PSR*

The Presentence Investigation Report calculates Mr. Burkhalter's offense level under U.S.S.G. § 2B1.1 to be 43. (PSR at ¶ 194). With a criminal history category of I and *zero* criminal history points, his advisory range would be "life." U.S.S.G. at Sentencing Table. The calculation is:

| **Guideline** | **Level(s)** | **Explanation** |
|---|---|---|
| § 2B1.1(a)(1) | 7 | Base Offense Level |
| § 2B1.1(b)(1)(N) | 26 | Loss between $150M and $250M |
| § 2B1.1(b)(2)(B) | 4 | Substantial Financial Hardship to 5 or more |
| § 2B1.1(b)(10)(C) | 2 | Sophisticated Means |
| § 2B1.1(b)(20)(A)(iii) | 4 | Violation of Securities Law and Investment Advisor/Broker-Dealer |
| § 3B1.1(a) | 4 | Aggravating Role |
| Adjusted Offense Level | 47 | |
| § 3E1.1 | -3 | Acceptance of Responsibility |
| **Total Offense Level and Advisory Range** | **43**[1] | |

However, the Guidelines also state that where the advisory range exceeds the statutory maximum, the advisory range becomes the statutory maximum, here

[1] The Sentencing Guidelines direct that an offense level more than 43 shall be treated as 43. U.S.S.G. Chapter 5, Part a, Note 2. (PSR at ¶ 194)

240 months. U.S.S.G. § 5G1.1(b); See PSR, p. 58. Accordingly, the correctly calculated advisory sentencing range is **240 months.**

This legally correct advisory range shifts the focus from the repetitive and overlapping enhancements under §2B1.1 which catapult the initial calculation to an unhelpful range of "life." Nevertheless, it is helpful to address the application of § 2B1.1 to demonstrate Mr. Burkhalter's acceptance of responsibility and how a rigid application of the fraud guideline can serve as a poor proxy for a reasonable sentence.

***Mr. Burkhalter's Objections***

**(1) Registered Broker-Dealer or Investment Advisor**

Mr. Burkhalter lodged two objections to the Guidelines. First, he objected to the application of § 2B1.1(b)(20)(A), which the PSR applied to increase the offense level by 4, stating there was a violation of the securities laws *and,* at the time of the offense, the defendant was either (ii) a registered broker or dealer, or a person associated with a broker or dealer, or (iii) an investment advisor, or a person associated with an investment advisor. U.S.S.G. §2B1.1(b)(20(A)(ii) and (iii). Mr. Burkhalter objected because, to his knowledge, there were no broker-dealers registered with the SEC at the time of the offense or any licensed investment advisors. In addition, the PSR did not identify these individuals. The final PSR states that Drive Planning employed broker-dealers and "financial advisors." (See

PSR at ¶ 186). Moreover, the final PSR states that Mr. Burkhalter acted as an "investment advisor." (Id.).

Rather than trying to intuit the PSR's position, a look at the case law appears to resolve the issue. The caselaw addressing this specific offense characteristic makes clear that this enhancement is remarkably broad and, in part, quite confusing. For example, in *United States v. Horn*, 129 F.4th 1275, the Court held that the definition of "registered broker or dealer" means an actual registered broker-dealer or someone who is not registered but who is *required* to register because they are selling securities. *Id.* at 1295 (citing § 2B1.1 cmt. 16) (citing to the application note which defines the term by reference to 15 U.S.C. § 78c(a)(48)). This seems to defy the plain meaning of an unambiguous Guideline which requires a "registered" broker-dealer. Moreover, that interpretation would mean that anyone who sells a "security" and who is not an actual registered broker-dealer, not only violates the securities laws (a separate requirement for § 2B1.1(b)(20)(A))[2] but automatically become a "*registered* broker dealer" for purposes of the enhancement. This begs the question: when would it *not* apply?

No matter, because the alternative definition – "investment advisor" is perhaps even broader. And in the final iteration of the PSR, Mr. Burkhalter is

[2] The PSR does not state whether or how the securities laws were violated. However, in the spirit of accepting responsibility, Mr. Burkhalter did not raise this issue in an objection.

identified as having acted as an "investment advisor." (PSR at ¶ 186). To be clear, neither Mr. Burkhalter, nor anyone to his knowledge, at the time of the offense, was a licensed securities advisor. The Eleventh Circuit, however, has rejected this as a requirement, holding that the enhancement applies regardless of education, licensing, or training. *United States v. Elia*, 879 Fed. Appx. 752 754-55 (Sep. 2, 2014, 11th Cir.) (unpublished) (citing *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995)). It applies to anyone who, for compensation (i.e., any economic benefit), counsels investors as to the advisability of investing in or purchasing a security. *Id*. Thus, as with the "broker-dealer" prong, the question becomes, when would a salesperson *not* be an "investment advisor" when selling a "security." The answer seems to be, never.

So, given the breadth of how this enhancement is applied, and in the spirit of accepting responsibility, Mr. Burkhalter agrees that §2B1.1(b)(20)(A) may apply in this case. Its application does show, however, the eagerness with which the fraud guidelines stack enhancements, forcing courts to try to avoid what has been described as "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (imposing 42-month sentence on life guideline range).

**(2) Sophisticated Means**

That said, the only remaining objection is to the PSR's contention that Mr. Burkhalter engaged in conduct amounting to sophisticated means under §2B1.1(b)(10). (PSR at ¶ 185). Here, Mr. Burkhalter has the better argument. In the interests of efficiency, Mr. Burkhalter will be brief, as a two-point victory would result in a reduction to offense level 42 and an advisory range of 360-life, again above the statutory maximum and therefore advisory range of 240 months. Still, it is important to note that the basis offered in the PSR does not meet the definition.

Section 2B1.1(b)(10)(C) was amended in 2015 to narrow the focus of the enhancement to the sophistication of the defendant's individual conduct. To be clear, the enhancement still requires that the offense involved sophisticated means but now, the defendant must have "intentionally engaged in or caused the conduct constituting sophisticated means." *Id*. The commentary defines "sophisticated means" as "*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of the offense." *Id*. cmt. n.9(B) (emphasis added). By its plain wording, the commentary expresses the Commission's guidance that efforts to execute or conceal the offense that are <u>not</u> especially complex or intricate, do not trigger the increase. What then is especially intricate or complex?

The commentary lists as examples the intentional location of telemarketing soliciting operations in a separate jurisdiction from a home office, and hiding

assets or transactions through fictitious entities, corporate shells, or offshore accounts. *Id*. These examples reflect advance, deliberate structuring of corporate entities, accounts, and operations in to facilitate the perpetration of or hide fraudulent conduct. None of that existed here.

Typically, district courts have broad discretion when deciding whether to impose this enhancement and are reviewed for clear error. So, as would be expected, reported cases typically affirm sentencing court decisions based upon a broad range of fact patterns. However, care should be taken to remain true to the guidance that *especially sophisticated* behavior should be required. Otherwise, the enhancement would mean nothing and apply in virtually every fraud case, improperly skewing the offense level higher. The examples cited by the PSR are not nearly enough.

The PSR merely recites the language of the adjustment and then states that Mr. Burkhalter ran a Ponzi scheme and committed fraud. (PSR at ¶ 185). Although the PSR attempts to reframe basic fraud facts into sophisticated means, it simply states offense conduct central to any fraud. For example, it cites fraudulent marketing and promotional materials and false advertising to investors and false information given to his sales team. (Id.). Contrary to the PSR's characterization, this is not "extensive layers of concealment" to avoid detection. (Id.). This *was* the fraud and is core to any fraud.

Nor is the behavior cited in the PSR *especially* complex or sophisticated. There were no corporate shells, false accounts, fake names, or offshore holdings. The bank accounts which the PSR cites, as representing sophisticated activity, were in Mr. Burkhalter's own name and/or the name of the company, not a fictitious entity. There were no allegations of sophisticated money laundering or passthrough accounts. Moreover, the fact that it occurred over time and involved a broad range of investors (PSR at ¶ 185) does not make it sophisticated. Whether a scheme is "otherwise extensive" relates to Mr. Burkhalter's admitted leadership role under §3B1.1 (PSR at ¶188), not sophistication.[3] *See United States v. Sethi*, 702 F.3d 1076, 1080 (11th Cir. 2013) (noting that these two enhancements are distinct and upholding application of both when supported by independent facts).

Even if this objection is correctly sustained, Mr. Burkhalter's range still lies beyond the statutory maximum of 240 months at 360-life (Category I/Offense Level 42). Therefore, his Guideline remains 240 months. From that point, the Court should adjust downward to recognize Mr. Burkhalter's acceptance of

---

[3] The inquiry about whether criminal activity was "otherwise extensive" looks at the use of outsiders who are not culpable, such as real estate companies cited by the PSR in favor of the sophistication enhancement. *See* U.S.S.G. § 3B1.1, Application Note 3. *Sethi*, supra. at 1080 (noting that leadership enhancement is concerned with "how far" and "who"). Regardless, the use of these parties certainly does not make the fraud sophisticated.

responsibility under §3E1.1. The application of §3E1.1 to the literal off-the-charts offense level calculation would otherwise be purely academic.

**B. The Court Should Adjust Downward to Appropriately Account for Acceptance of Responsibility Under U.S.S.G. §3E1.1.**

In 1995, when the Sentencing Guidelines were mandatory, the Eleventh Circuit decided *United States v. Rodriguez*, 64 F.3d 638 (11th Cir. 1995). In *Rodriguez*, the Court held that where a defendant's advisory range falls above a statutory maximum, then a sentencing court may depart downward to give the defendant the benefit of the acceptance of responsibility reduction under U.S.S.G. § 3E1.1. *Id*. at 643. In that circumstance, as explained by *Rodriguez*, § 5G1.1(a) establishes that the statutory maximum becomes the guideline. However, the benefit of acceptance is lost because § 3E1.1's application becomes theoretical, i.e., beyond the maximum. After *Booker*, the Eleventh Circuit has reaffirmed a sentencing court's discretion to depart or adjust downward to reward acceptance of responsibility when the advisory guideline range is above the statutory maximum. *United States v. Blanco*, 102 F.4th 1153, 1167-1168 (11th Cir. 2024); *United States v. Arcila Ramirez*, 2023 WL 3477811 at * 4 (11th Cir. 2023) (unpublished).

Here, because the range is beyond the statutory maximum, *Rodriguez* applies. And, according to the reasoning of *Rodriguez* and the Eleventh Circuit cases post-*Booker*, the Court has the discretion to adjust downward to implement

3E1.1. With a Criminal History Category of I, the highest range within which 240 months falls is Offense Level 37 (210-262). U.S.S.G. at Sentencing Table. A three-level reduction would result in an Offense Level 34, with a range of 168-210. *Id*. at Offense Level 34. The government is asking for 210. Mr. Burkhalter is asking for 168. The Court should look to the low end of this range to appropriately account for § 3E1.1.

Mr. Burkhalter acceptance of responsibility strongly supports this requested outcome. Mr. Burkhalter was brought to the government by virtue of a target letter. The parties reached a resolution which avoided the need for the government to go to the grand jury. Instead, Mr. Burkhalter agreed to proceed by criminal information, waiving his right to indictment. (Docs. 1 and 2). Mr. Burkhalter entered into a Plea Agreement which included his stipulation to almost all the U.S. Sentencing Guideline adjustments contained in the PSR under Chapter Two and Three. (Doc. 8-1). Specifically, Mr. Burkhalter agreed to the loss range, the victim adjustment, and the role increase. (Id. at ¶ 13b). He offered little factual objection to the PSR and, after review, has not challenged the 4-level investment advisor increase. (PSR at ¶ 186). At his plea, Mr. Burkhalter agreed to a fulsome factual basis drafted by the government. Finally, in the Plea Agreement, knowing the statutory maximum of 240 months and that the range would likely exceed this number, the government agreed that Mr. Burkhalter should receive a full

reduction for acceptance of responsibility pursuant to Section 3E1.1. Without an adjustment under *Rodriguez*, this language becomes meaningless. Mr. Burkhalter should receive the benefit of a reduction under *Rodriguez* to make his range 168-210.

### C. Courts Have Criticized Unmitigated Ranges Under § 2B1.1 as a Poor Proxy for a Reasonable Sentence.

The advisory range is *not* presumed reasonable because a technical application of the Sentencing Guidelines and the resulting range can be unjust. Since its inception in 1987 (then as § 2F1.1), § 2B1.1 and its commentary have expanded over the ensuing 33 years with incremental and *unexplained* increases to the base offense level, perhaps more than any other Guideline. *See Adelson*, 441 F.Supp.2d at 510 (cataloguing § 2B1.1 enhancements and noting that the Sentencing Commission has never explained its rationale for each or the chosen weight). In many cases, because of § 2B1.1's ever-expanding specific offense characteristics, the fraud guideline range can be unreasonable and unhelpful.

Often, there is good reason to contemplate a sentence different than the resulting range after application of overlapping and repetitive enhancements in under § 2B1.1. Indeed, in *United States v. Parris*, 573 F. Supp. 2d 506 (S.D.N.Y. 2008), Judge Fredrick Block from the Eastern District of New York lamented the draconian effect of the repetitive enhancements under §2B1.1. There, Judge Block sentenced the defendants to 60 months in the face of a guideline range of 360

months to life. Id. at 745. The case involved a "'pump and dump' scheme in the world of the high-risk penny-stock investors" involving millions in gains to the defendants. *Id*. at 746-747. There were over 250 victims.

Judge Block characterized the case as another example where the guidelines "have so run amok that they are patently absurd on their face" because of the "piling on of points for which the guidelines have frequently been criticized." *Id*. at 745. (quoting *Adelson*, supra. at 510, 515) (quotes omitted). Looking for some basis beyond the advisory range, Judge Block settled on rough comparison to other frauds because it was "difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *Id.* at 751.

Judge Block relied upon a broad compendium of cases and corresponding sentences extending back over the previous decade. Id. at 752.[4] Recognizing that each case is fact-specific and subject to variables, such as whether a defendant pleads guilty or goes to trial, the Court noted a correlation between loss, as a measure of seriousness, and sentencing. Id. at 753. The Court observed: "Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id*.

[4] That compendium is attached to the *Parris* decision. *Id*. at 757-763.

On the double-digit side of the government's list of cases were:

| Name | Amount of Loss | Sentence |
|---|---|---|
| Bennett | $100 million | 14 years |
| Ebbers | over $100 million [8] | 25 years |
| Rigas (John) | over $200 million | 15 years |
| Rigas (Timothy) | over $200 million | 20 years |
| Skilling | over $1 billion | 24 years |
| Forbes | approx. $14 billion | 10 years |
| Kumar | $2.2 billion | 12 years |
| Ferrarini | $25 million | 145 months |

Id. at 753. Of these defendants, all but Kumar and Ferrarini went to trial. Bernie Ebbers (WorldCom), the Rigas brothers (Adelphia), and Jeffrey Skilling (Enron) were involved in some of the largest corporate frauds in history, and each went to trial. Comparison to these cases was difficult because of the enormity of the fraud. Nevertheless, the court pointed out that, even in those cases, the sentences imposed, after trial, were below, sometimes well below, the low-end range in *Parris*, an inconceivable notion. *Id*. at 746.

On the single digit side were:

| Name | Amount of Loss | Sentence |
|---|---|---|
| Hotte | $67 million | 108 months |
| Formisano | $9.8 million | 78 months |
| Smirlock | $12.6 million | 48 months |
| Adelson | $50-$100 million (intended) | 42 months |
| Betts | $1.3 million | 366 days |
| Chavrat | $1.1 million | 6 months |
| Tursi | $1.1 million | 41 months |
| Scuteri | $2.5 million | 21 months |
| Kearney | $1.3 million | 51 months |
| Rutkoske | $12 million | 108 months |
| Cushing | $24 million | 97 months |

Id. at 753. Thus, in the securities fraud context, loss amounts ranging from $1.1 million to $100 million resulted in sentences of 366 days to 108 months at the top end.[5] Many of these cases involved significant personal gain to the executives and numerous victims.[6]

Of course, Mr. Burkhalter is not asking for a single-digit sentence in light of the loss and impact on victims. Rather, *Parris* offers an instructive analysis to assist the Court in reaching a reasonable sentence.

A similar analysis and criticism of 2B1.1 was undertaken by Judge Jed Rakoff in *Adelson*, supra. In *Adelson*, Judge Rakoff was faced with a 360-life range

---

[5] For Betts, Chavarat, Tursi, and Scuteri, the scheme involved 21 brokers who together caused a loss of $88 million. *Id*. at Appendix A.

[6] The court made it clear that it did not just consider loss but also the "one-shoe-fits-all" approach to the numerous enhancements including number of victims, leader, and serving as an officer/director of a public corporation. *Id*. at 755.

for a Category I defendant, the COO of a public company who was a late participant in a securities fraud scheme with a government-calculated loss of $260 million. After application of the §2B1.1 enhancements, the court was left with an offense level 46, which was 9 points less than the level 55 recommended by the government. *Adelson*, 441 F.Supp.2d at 511. Confronted with "an absurd guideline result that not even the government seriously defended," the court chose to focus on other factors but with a keen awareness of far lower sentences handed out in large frauds, such as WorldCom and Adelphia. *Id*. at 512.

Notably, unlike in this case, both *Parris* and *Adelson* involved convictions on multiple counts, where the statutory maximum would not have offered a lower guideline range. In *Adelson*, the advisory range of life imprisonment was cabined only by the maximum of 85 years under the counts of which Mr. Adelson was convicted. *Id*. at 507. He went to trial. In *Parris*, after trial, the defendants were convicted of six counts, including conspiracy to commit securities fraud, securities fraud, and witness tampering. *Id*. at 746. There was no real upper limit on the guidelines range.

Here, there is a 240-month cap and range of 168-210 after *Rodriguez*. Even with this limitation, the analyses and criticisms from *Parris* and *Adelson* are instructive to determine a reasonable sentence.

### D. Sentencing Commission Data Show That Courts Impose Sentences in Fraud Cases Less Than the Advisory Range with Regularity.

The extent of judicial "compliance" with the Guidelines is not a good measure of reasonableness post-*Booker*. *Id*. at 888 (quoting Judge Nancy Gertner, *United States v. Whigham*, 754 F. Supp.2d 239, 252 (D. Mass 2010)). That is certainly the case when faced with a range that, according to Judge Block, simply does not provide realistic guidance. *Parris*, 573 F.Supp.2d at 751. Accordingly, U.S. Sentencing Commission statistics reveal a healthy system where sentences frequently deviate from the guideline ranges including under § 2B1.1.

The Sentencing Commission data from fiscal years 2015-2025 is revealing. For years 2015-2025, the national average sentence length for defendants *sentenced to incarceration* under U.S.S.G. § 2B1.1 is 30 months, with a median of 21 months.[7] Within the Eleventh Circuit, the average length of incarceration imposed under § 2B1.1 is 37 months, with a median of 29 months.[8] These numbers account for sentences imposed across all criminal history categories and loss amounts. For Criminal History Category I, for those who were sentenced to incarceration, the

[7] U.S. Sentencing Comm'n, *Interactive Data Analyzer, Average and Median Sentence Length* https://ida.ussc.gov/analytics/saw.dll?dashboard (last visited 08/06/26).

[8] *Id*.

numbers are even lower. In the Eleventh Circuit, for Criminal History Category I, the average is 35 months, with a median of 24 months.[9] Within our circuit, for years 2015-2025, district courts imposed sentences *below the advisory range*, under § 2B1.1, 38.8% of the time.[10] For years 2021-2025, this occurred in 40.5% of cases. These figures exclude § 5K1.1 departures.

Of course, there are cases which fall *above* these average sentence lengths. And Mr. Burkhalter recognizes that his is one of them. The issue, however, becomes what sentence is sufficient but not greater than necessary considering the § 3553 factors, including his lack of criminal history. For fiscal years 2021 to 2025, in the Eleventh Circuit, only 2.6% of § 2B1.1 defendants in Criminal History Category I received sentences of incarceration between 10 and 20 years.[11] Here, both parties are asking for a sentence within the range of 168-210, the result after *Rodriguez* is applied. Sentencing Commission data shows that, from 2015-2025, in the Eleventh Circuit, for Criminal History Category I, district courts imposed a sentence at the guideline minimum in 65.6% of the cases. Courts imposed

---

[9] *Id*.

[10] U.S. Sentencing Comm'n, *Sentence Imposed Relative to Guideline Range*, https://ida.ussc.gov/analytics/saw.dll?dashboard (last visited 08/06/26).

[11] U.S. Sentencing Comm'n, *Interactive Data Analyzer, Distribution of Imprisonment Length*, https://ida.ussc.gov/analytics/saw.dll?dashboard (last visited 08/06/26).

sentences at either the minimum or the lower half of the range in 80.5% of the cases.[12]




This data accounts for all specific offense characteristics, including loss and victims, as well as adjustments under Chapter 3. These sentencing statistics weigh in favor of a sentence of 168 months, the lower end, as do the § 3553 factors, particularly Mr. Burkhalter's personal history and characteristics.

**E. Mr. Burkhalter's Personal History and Characteristics Weigh in Favor of a Sentence of 168 Months.**

Todd Burkhalter, now 55 years old, was born at DeKalb General Hospital in Atlanta, Georgia. He was raised in Decatur by his parents, Richard and Brenda Burkhalter, who were married for 54 years until Brenda's passing approximately

[12] *See* footnote 10, surpa.

four years ago. The family was not wealthy, but they were anchored by strong values of generosity, faith, and community.




*Richard Sr. (Father), Todd, and Rick (Brother)*

Richard Burkhalter owned his own meat company and structured his schedule around his children, never missing a game or an event. He also coached Todd and his brother in baseball and served as president of the local park. Brenda was a devoted stay-at-home mother who was deeply involved in her children's schooling — serving in the PTA, volunteering as a classroom mom, and ensuring that every child in Todd's class felt celebrated on their birthday. Before having children, Brenda worked as an assistant to U.S. Senator Richard B. Russell. One of Todd's earliest memories captures the spirit of his upbringing: on Christmas Eve, his father quietly drove to a struggling family's home and left gifts and food on

their doorstep, anonymously. Richard also took in his own mother when she could no longer support herself, even though other siblings — who had equal or greater means — declined to do so. The family simply helped because they could.

Todd has one brother, Rick, who is four years his senior. Rick and his wife Robin live in Alpharetta and have three daughters. The family recently celebrated an important milestone: Rick's youngest daughter, Ally (25), was pronounced cancer-free after a year-long battle with esophageal cancer that required surgery, chemotherapy, and radiation.

**Education**

Todd attended Redan Elementary School and later Redan High School, a diverse institution that reflected the broader Atlanta community he grew up in. He was a standout baseball player — earning "Player of the Year" honors — and a natural leader among his peers. He was a self-described average student academically, though not for lack of ability.




*Todd's Youth Baseball Photo*

Todd went on to play baseball at Kennesaw State University before transferring to Abraham Baldwin Agricultural College (ABAC), where he played as team captain and earned an associate's degree in economics on scholarship. He later transferred to Valdosta State University, where he majored in marketing and business administration. He supplemented his education with online finance coursework through NYU, including a certification program that trained him to help seniors navigate the financial, cognitive, and psychological dimensions of retirement.

**Family**

Todd has three children from his first marriage to Christina Perry, whom he married in 1996. His oldest daughter, Mallory (26), recently married and lives in Decatur with her husband, who owns a roofing company. His son JP (21) is in graduate school studying religion and aspires to become a pastor; he lives in Athens, Georgia with his wife and works at a Christian school. His daughter Georgia (21) — JP's twin — is completing graduate studies in mathematics at the University of Tennessee, where she also teaches. Georgia was part of a research committee that studied a mathematical formula governing how water displacement affects erosion, work that has implications for how insurance companies calculate erosion coverage. She was published for her contributions. Todd speaks with all three of his children every day.



*Children: Mallory, JP, and Georgia*

Todd coached his children in soccer and baseball when they were young, often alongside his father, whom the kids called "Coach Grandpa."

Todd has been in a committed relationship with his girlfriend, Ashley, for four years. His children are close to Ashley, and by all accounts the family remains tight knit despite the challenges of recent years.

**Career and Community Contributions**

Mr. Burkhalter graduated with a bachelor's degree from Valdosta State in 1995. (PSR at ¶ 221). During college, for several years, he worked at a golf course to help pay for his expenses. After college, he worked at Southern Copy Machines,

selling copiers and fax machines, which taught him the basics of working in sales and customer service.

With his background in sales, in 1997, he joined the Johnson Financial Group (an agency of American United Life), a financial services firm, where he worked for twelve years, eventually becoming a lead advisor. Mr. Burkhalter sold insurance, annuities, and mutual funds at this company until 2009. He was a commissioned advisor. The company actively supported charitable causes and partnered with World Vision, an international humanitarian organization. Through that partnership, Todd and his wife contributed $20,000 toward the construction of an industrial well in Honduras — enough to serve three separate communities with clean water. He later received footage of those communities celebrating the arrival of clean water, a moment he describes as one of the most meaningful of his life.

In 2006, while with Johnson Financial Group, Todd traveled to Guatemala on a mission trip, where he and a group of volunteers built a new roof for an elementary school, constructed homes, and helped establish a women's shelter, donating clothing, household supplies, and hygiene products. He gave the shoes off his feet to a local man who had none.

In 2009, at the age of 38, Todd launched Catalyst Wealth Management in Johns Creek, Georgia, selling mutual funds, insurance, and annuities. From the

outset, he built the practice with a deliberate commitment to serving clients who did not traditionally have access to professional financial products or planning services. He worked at Catalyst for six years as a part-owner and commissioned advisor. Mr. Burkhalter worked in this capacity until 2013. As a result of a contentious divorce which led to financial struggles because of large alimony and child support obligations, Mr. Burkhalter's partners bought his interests, the proceeds of which went to his ex-wife. He lost all his income and most of his assets.

From 2013 to 2015, Mr. Burkhalter went to work with a friend in his business, DDS Financial, which provided financial services, products, and practice management to dentists. Despite this opportunity, Mr. Burkhalter was struggling financially to meet his alimony and child support payments. He rented an apartment and lived check-to-check. Mr. Burkhalter looked at this job as a transitional period until he managed to get back on his feet.

In 2015, Todd founded Drive Planning in an attempt to echo a portion of the business model he experienced at DDS, which included financial planning, insurance, and eventually trying to sell private offerings to non-traditional investors. Initially, Mr. Burkhalter sold life and disability insurance as well as financial planning services. For several years, Mr. Burkhalter ran his business with that focus. He was an owner and was paid commission on the sales of the products and services. Mr. Burkhalter did not attempt to sell investors participation in

private business ventures until 2018. The REAL and CORE products were not formulated until 2020. While at Drive Planning, Mr. Burkhalter continued to support clean water access to underserved communities through charitable donations, including through the Drive Clean Water Initiative.

Over the years, Todd has donated to numerous causes: $50,000 to the Mary Smith Women's Center in St. Petersburg (a shelter for survivors of domestic violence); ongoing support for World Vision; contributions to several churches; and direct, personal acts of generosity — including paying approximately $2,000 out of pocket to ensure a recently unemployed stranger could celebrate Christmas with his family. When he told his daughter Mallory about children in Guatemala using a melon as a soccer ball, she immediately began gathering her own toys to donate.

**Medical History**

At age 46, Todd suffered a heart attack while walking his dog near his home in Midtown Atlanta. He was without his phone or wallet when he felt sudden, severe chest pressure and difficulty breathing. He managed to return to his building and alert his wife, who called 911. He was transported to Emory University Hospital, where he underwent a single bypass surgery, had five stents placed, and remained hospitalized for two weeks. He also learned he had a deep

vein thrombosis — a blood clot extending from his ankle to his upper leg — which he continues to manage.

The heart attack was unexpected. Todd had no prior cardiac history, exercised regularly, maintained a vegetarian diet, and was by all accounts in excellent physical condition. He suffers from high blood pressure and high cholesterol. Thus, at 55, Mr. Burkhalter continues to experience physical health issues from his prior heart attack. He recognizes the importance of managing his health with diet and exercise. Mr. Burkhalter's age and medical condition should be considered when the Court determines a reasonable sentence. In sum, Mr. Burkhalter's personal history and characteristics, including lower rates of recidivism from defendants of his age, support the requested sentence.

Mr. Burkhalter's family and friends have submitted several letters on his behalf for this Court's consideration. A copy of the same is attached hereto as **Exhibit A**.

## CONCLUSION

WHEREFORE. For the foregoing reasons, Mr. Burkhalter respectfully respects that this honorable Court impose a just and reasonable sentence in the above-styled case of 168 months.

This 10th day of August 2026.

*/s/Allison C. Dawson*
ALLISON C. DAWSON
Georgia Bar No. 171940

*/s/ Thomas L. Hawker*
THOMAS L. HAWKER
Georgia Bar No. 338670

Attorneys for Todd Burkhalter

Federal Defender Program, Inc.
Sute 1500, Centennial Tower
101 Marietta Street, NW
Atlanta, Georgia 30303
(404)688-7530